## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH FACELLA | ) | |
| | ) | |
| Petitioner, | ) | **CIVIL ACTION** |
| | ) | **NO. 4:19-CV-40025-TSH** |
| | ) | |
| v. | ) | |
| | ) | |
| COLETTE GOGUEN | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION
### October 8, 2021

Hennessy, M.J.

 Petitioner Joseph Facella, proceeding pro se, filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction for the murder of his girlfriend.  [Dkt. Nos. 23, 43].  Respondent Colette Goguen opposes this motion.  [Dkt. No. 47].  The matter was referred to me pursuant to 28 U.S.C. § 636(b)(1)(B), and Fed. R. Civ. P. 72(b). [Dkt. No. 35].  For the reasons that follow, I hereby recommend that the petition be DISMISSED.

I.     FACTUAL BACKGROUND

The facts underlying Petitioner's conviction, summarized below, are set out in the opinion of the Supreme Judicial Court of Massachusetts ("SJC").  Commonwealth v. Facella, 478 Mass. 393 (2017).[1]

---

[1] See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."); see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015).

A.  Victim's Death

At around 9:30 p.m. on April 25, 2002, [Petitioner] walked into the emergency room at the Merrimack Valley Hospital. He told the triage nurse that he had "somebody" who "wasn't breathing" in the back seat of his motor vehicle. Emergency room personnel immediately went outside and observed the victim lying face down and "wedged down tight" between the front and back seats of the vehicle. The victim was topless, had no pulse, and was "very badly bruised ... [a]ll over her body."

Once the victim was removed from the vehicle and brought inside the hospital, it became apparent that she had severe blunt force trauma to her face and head. The swelling was so extreme that the victim's head was swollen to "twice or three times the normal size" and her facial features were impossible to discern. A medical team immediately began resuscitation efforts.

When hospital personnel asked [Petitioner] what happened, he initially said that he had found the victim outside in that condition and that Billerica police were responsible. [Petitioner] repeatedly interrupted the resuscitation efforts to ask whether the victim would be all right. A triage nurse testified that [Petitioner] smelled of alcohol and appeared to be under the influence of alcohol, but not extremely so.

Within one hour, the victim's pulse was restored, but she was breathing only with the assistance of a ventilator. However, testing showed that the victim had suffered serious brain injuries and had blood in her brain, so doctors decided to transfer her to a hospital in Boston for further treatment.

Id. at 395–96.

B. Police Interviews

Prior to the victim's transfer to Boston, the Haverhill police questioned Petitioner regarding the circumstances of the victim's death. Id. at 396. Petitioner gave several conflicting accounts of his discovery of the victim. Id. The police observed Petitioner's swollen knuckles and hands, as well as dried blood on his "ear, chest, shoulder, and arm." Id. The police subsequently advised Petitioner of his Miranda rights, but they did not place him under arrest. Id. Petitioner followed

the police to the Haverhill police station, where he was interviewed for "approximately sixty to ninety minutes." Id. The victim died after the interview had taken place, and Petitioner was arrested. Id. at 397.

C. Events Before the Victim's Death

The day before the murder, the victim had accompanied her friend, Dawn Michelle Rippetoe, to dinner. Id. at 397–98. Around 11:15 p.m., Rippetoe and the victim arrived at Rippetoe's house to sleep. Id. at 398. Soon thereafter, the victim left Rippetoe's house. Id. She was encountered a quarter hour later by Billerica police responding to a call that a "female [was] wandering around the woods, making noises." Id. Police placed the victim in protective custody. Id. While at the police station, the victim became belligerent and did not answer booking questions. Id. The victim was released the next morning between 8:00 and 8:30 a.m. Id.

Shortly after the victim was released, the Billerica police responded to a call from a local Ford dealership where an employee told police that Petitioner, who was at the dealership for a tire change, looked and smelt intoxicated, and was drinking "from a fifth of vodka." Id. The police placed Petitioner in protective custody. Id. On the way to the police station, Petitioner asked an officer, "how would you feel if your wife didn't come home last night?" Id.

Around 10 a.m., the victim discovered that Petitioner was in protective custody. Id. She requested that an officer ask Petitioner to give the victim money and keys to her car so she could recover it from the impound. Id. Petitioner turned over the keys and money, but not the key to the condominium. Id. Around 1 p.m., the victim went to Rippetoe's home "crying, wearing mud-stained clothes," and apparently "in disarray." Id. Rippetoe noticed bruises on the victim's body. Id. Around 3:20 p.m., Petitioner was released from protective custody. Id. He became upset

upon learning the victim had not come to pick up Petitioner.  Id.  He left the police station, returned to the Ford dealership, paid for his tire change, and drove away between 4:15 and 4:30 p.m.  Id.

Before the victim left Rippetoe's home around 5:30 p.m., she called Petitioner and Rippetoe overheard Petitioner "screaming, swearing, and threatening the victim."  Id.  Rippetoe also heard Petitioner say, "I'm going to f-ing kill you. You got me in trouble with the police. I told you if you got me in trouble with the police, I would kill you."  Id.  The victim then left, appearing "hysterical and very upset."  Id.

D.  The Trial

On May 15, 2002, an Essex County grand jury indicted Petitioner for first degree murder, in violation of Mass. Gen. Laws ch 265, § 1.  [Dkt. No. 47 at 8; Dkt. No. 17 at 2, 4].  Petitioner pleaded not guilty in July 2002.  [Dkt. No. 47 at 8; Dkt. No. 17 at 4].

1.  Petitioner's Interferon Defense

At trial, Petitioner's defense was that an antiviral drug he was taking at the time of the killing rendered him unable to appreciate the wrongfulness of his conduct or to conform his behavior to the requirements of the law.  Facella, 478 Mass. at 394.  The SJC summarized the defense as follows:

> [Petitioner's] case was built around the claim that, at the time of the killing, he had been taking interferon to treat a hepatitis C infection. He presented testimony from two medical experts and three family members.
>
> The first medical expert, a physician specializing in gastroenterology, described how interferon works to combat hepatitis C. He also described the known side-effects of interferon, which include "mental and neurological side effects" such as depression, fatigue, lack of appetite, and—most pertinent here—irritability and aggression. The expert estimated that around one-third of interferon patients experience some degree of depression or mood alteration, while around five to ten per cent experience increased irritability.
>
> The second medical expert, a psychiatrist and psychopharmacologist, described in more detail how interferon may disrupt normal serotonin functions in the brain,

which in turn can result in mood changes, impulsivity, aggression, and difficulty modulating behavior. He estimated that somewhere between twenty-five and forty-five per cent of interferon patients may experience behavioral side effects from serotonin disruption, and that these effects may last for months after taking interferon. He opined that interferon may impair a person's capacity to, inter alia, weigh the pros and cons of his actions, refrain from committing certain acts, and form the intent to kill or injure.

Members of [Petitioner's] family testified that he began taking interferon in the fall of 2001. They testified to various mood changes that they noticed following this treatment, including increased agitation, irritability, depression, and argumentativeness.

Although the focus of this testimony was the effect of interferon on [Petitioner] in 2001 and 2002, there also was evidence in the form of medical records indicating [Petitioner] had been treated with interferon for six months beginning around 1994 or 1995. The family members were not aware of this earlier treatment or were unsure whether they knew about it.

Facella, 478 Mass. at 400.

## 2. Rebuttal Evidence

The Commonwealth introduced two witnesses in rebuttal who testified Petitioner had been violent toward women prior to taking the medication.  Id. at 403.  The SJC summarized the rebuttal witnesses' testimonies as follows:

The first [rebuttal witness], a former girlfriend of [Petitioner], testified to the emotional and physical abuse she suffered during the course of their relationship, which spanned from approximately 1978 to 1983. She described how [Petitioner] inflicted upon her over a dozen black eyes, numerous bruises, and several cigarette burns on her hands, shoulder, and chest. She testified that [Petitioner] would strike her in the face whenever the songs by a former boyfriend, who was a musician, came on the radio, and related one incident where [Petitioner] beat her with a long metal bar because she had turned down the heat too low in their apartment. She said, "It didn't really seem to matter what would spark [Petitioner's] temper." She also testified that [Petitioner] once threatened to kill her and, on another occasion, to "mess up your face [so] bad that no one will ever want to look at you again."

The second rebuttal witness was a former assistant district attorney who handled the plea colloquy in a prosecution of [Petitioner] in 1990. The witness authenticated a memorandum that he had prepared for the plea hearing, which the plea judge then read in open court, with [Petitioner] objecting to or correcting certain facts with which he did not agree. A redacted version of the

> memorandum was read into the record. It described an incident in 1989 in which
> [Petitioner] threatened to kill his former girlfriend. [Petitioner] kicked her while
> wearing cowboy boots, dragged her by her hair, whipped her with a bullwhip,
> burned her with a cigarette, and "beat her repeatedly until she was covered with
> blood."

<u>Facella</u>, 478 Mass. at 403.

## II.   PROCEDURAL HISTORY

### A. <u>State-Court Proceedings</u>

On December 16, 2005, the jury found Petitioner guilty of first-degree murder committed with extreme atrocity or cruelty.  [Dkt. No. 17-1 at 9]; <u>Facella</u>, 478 Mass. at 394. Petitioner was subsequently sentenced to life in prison.  [Dkt. No. 17-1 at 9].  Petitioner timely appealed his conviction to the SJC, and the appeal was entered on the SJC's docket in December 2008.  [<u>Id.</u> at 11].  The SJC heard oral argument on May 5, 2017.  [<u>Id.</u>; Dkt. No. 19 at 2 n.2].[2]  On June 13, 2017, Petitioner filed a motion for a new trial claiming, inter alia, that he received ineffective assistance of counsel.  [Dkt. No. 47 at 8; Dkt. No 17-1 at 13].  On November 21, 2017, the SJC affirmed Petitioner's conviction and denied his motion for a new trial.  <u>Facella</u>, 478 Mass. at 395.

### B. <u>Petitioner's Habeas Corpus Action</u>

On January 30, 2019, Petitioner filed this petition pursuant to 28 U.S.C. § 2254, seeking relief through four separate claims: (1) the trial judge erred by admitting evidence of the defendant's prior incarceration; (2) the trial judge erred by giving untimely limiting instructions regarding prior bad act evidence; (3) the trial judge erred by admitting evidence of the defendant's prior bad acts in the Commonwealth's rebuttal case; and (4) ineffective assistance of trial counsel. [Dkt. No 1 at 6–11].  On May 22, 2019, Respondent moved to dismiss the petition, alleging the first three claims were unexhausted.  [Dkt. No. 16].

---

[2] The case was subject to a series of procedural delays.  [Dkt. No. 19 at 2 n.2].

On February 24, 2020, the Court dismissed Petitioner's first three claims as unexhausted and gave Petitioner leave to refile an amended petition to proceed on his fourth claim: ineffective assistance of counsel.  [Dkt. No. 19 at 9].  On June 9, 2020, Petitioner filed an amended petition, alleging his trial counsel was constitutionally ineffective.  [Dkt. No. 23 at 5].

III.   LEGAL STANDARD

"Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner must show that the challenged state court adjudication was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or that the decision 'was based on an unreasonable determination of the facts.'"  Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013) (quoting 28 U.S.C. § 2254(d)). "Clearly established federal law" under § 2254(d)(1) refers to the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision" and must be "holdings, as opposed to the dicta."  Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003) (internal quotations omitted).  A state court decision is "contrary to" existing Supreme Court precedent if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but reaches a result different from Supreme Court precedent.  Dagley v. Russo, 540 F.3d 8, 16 (1st Cir. 2008) (quoting Early v. Packer, 537 U.S. 3, 8 (2002)).

The standard of review of the state court decision is "highly deferential" and "requires the petitioner to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement.'"  Pena, 736 F.3d at 603 (quoting Burt v. Titlow, 571 U.S. 12, 20–21 (2013)) (alteration in original).   State court applications of federal law must be more than "incorrect or

erroneous" to merit habeas relief; they must be "objectively unreasonable." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 409 (2000)).  If fairminded jurists could disagree about the correctness of the state court's decision, then habeas relief is precluded.  Harrington v. Richter, 562 U.S. 86, 101 (2011).

The clearly established federal law in this case concerns Petitioner's right to effective assistance of counsel under the Sixth Amendment of the U.S. Constitution.  The Sixth Amendment states that the accused has a right to "have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  Under the Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), to prove a violation of his Sixth Amendment right to counsel, Petitioner must show:

> "First . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed [to Petitioner] by the Sixth Amendment. Second, [Petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable. Unless [Petitioner] makes both showings, it cannot be said that the conviction or … sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.  Thus, a defendant claiming constitutionally ineffective assistance of counsel must show that "(1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 684.

To demonstrate deficient performance, Petitioner must show that his "counsel's representation fell below an objective standard of reasonableness."  Id. at 688.  When evaluating performance, a court must grant "deference to counsel's informed decisions."  Id. at 681.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689

(quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)); <u>see</u> <u>Knight v Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006) (holding counsel is constitutionally deficient "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it."). Counsel is constitutionally ineffective when he makes an error, "unrelated to tactical choices or to some plausible strategic aim." <u>Scarpa v. Dubois</u>, 38 F.3d 1, 11 (1st Cir. 1994).

To demonstrate prejudice, Petitioner must prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Logan v. Gelb</u>, 790 F.3d 65, 71 (1st Cir. 2015) (quoting <u>Strickland</u>, 466 U.S. at 694). "For this purpose, a reasonable probability is defined as that which undermines confidence in the result of the proceeding." <u>Scarpa</u>, 38 F.3d at 16 (1st Cir. 1994). However, a court must not solely focus its attention on the result of the proceedings, but rather, it must determine whether the counsel's errors "renders the result of the trial unreliable or the proceeding fundamentally unfair." <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372 (1993). A court must "consider the totality of the evidence before the judge or jury," as some errors may only have had a "trivial" impact on proceedings, whereas others could "alter [] the entire evidentiary picture." <u>Strickland</u>, 466 U.S. at 696.

When a federal court reviews a state-court's application of <u>Strickland</u> under 28 U.S.C. § 2254, "the pivotal question whether the state court's application of the <u>Strickland</u> standard was unreasonable." <u>Richter</u>, 562 U.S. at 101. Essentially, the court "must determine what arguments or theories supported or, [] could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 102. The "standards created by <u>Strickland</u> and § 2254(d) are both highly deferential," so applying both standards is "doubly so." <u>Id.</u> at 105 (quotations omitted). "If this standard is difficult to meet, that is because it was

meant to be.  As amended by AEDPA, §2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected om state proceedings." Id. at 102.  The Strickland standard is a general one, therefore a state court has "substantial" range to reasonably apply it. Id.

When it adjudicated Petitioner's ineffective assistance claims, the SJC applied the Massachusetts standard for ineffective assistance of counsel.  Facella, 478 Mass. at 409. Massachusetts applies a "functional equivalent" to the federal standard developed in Strickland. Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011).[3]  Thus, the SJC's decision must be reviewed deferentially under § 2254(d) and to prevail, Petitioner must demonstrate that the SJC's application of Strickland was unreasonable, and that there is no "reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

## IV.    DISCUSSION

Petitioner alleges his counsel's performance was ineffective because he failed to (1) object to the hearsay testimony offered by officers Katz and Elmore regarding his intoxication the day before the murder; (2) request limiting instructions regarding the testimony of the victim's friends (Dawn Michelle Rippetoe and Paula L. Capaldo), and the victim's father; (3) limit harmful rebuttal evidence regarding Petitioner's history of violence against women; (4) call a specific psychiatric expert Petitioner requested; and (5) omit prejudicial personal remarks about Petitioner's bad character during closing arguments.  [Dkt. No. 23 at 5].  I address each allegation in turn.

### A.  Police Officers' Testimony

Petitioner first alleges that his trial counsel was constitutionally deficient because he did not object to hearsay testimony from two police officers regarding petitioner's intoxicated behavior at the Ford dealership on the day of the murder.  [Dkt. 43 at 4].  The testimony recounted

---

[3] Indeed, the Commonwealth applies a standard that is "more favorable" to a defendant than the "general constitutional standard." Facella, 478 Mass. at 409 (quoting Commonwealth v. Wright, 411 Mass. 678, 682 (1992)).

observations of the dealership employee about Petitioner's "strange and belligerent conduct" at the dealership.[4]  Petitioner argues that his counsel did not have "valid strategic reasoning" not to object to the hearsay testimony, and points towards his counsel's "seemingly casual response that he did not see any harm to the defendant,"[5] as evidence of ineffective assistance.  [Dkt. No 43 at 6].  The SJC rejected this argument, reasoning that "[e]ven assuming this testimony was erroneously admitted, it would not likely have influenced the jury's conclusion because it was cumulative of other properly admitted testimony."[6]  Facella, 478 Mass. at 410.

The SJC's conclusion was reasonable.  Counsel's choice not to object can "reasonably be viewed as a tactical decision."  See Gomes v. Brady, 564 F.3d 532, 540 (1st Cir. 2009); see also Lynch v. Ficco, 438 F.3d 35, 49 (1st Cir. 2006) (noting the petitioner had to prove that "no competent lawyer would have reasonably permitted [the testimony] to be given without objection").  Here, on the same trial day as the officers' testimony, the Ford employee who had called police testified that Petitioner was irate, apparently intoxicated, and drinking at the dealership; thus, the evidence of Petitioner's intoxication was before the jury regardless of the officers' testimony.  [Dkt. No 47-3 at 115].  As such, Petitioner has failed to demonstrate that "no competent lawyer" would have allowed the testimony to be given without an objection.  See Buehl v. Vaughn, 166 F.3d 163, 170 (3d Cir. 1999) ("In some circumstances … counsel may reasonably conclude that it is strategically preferable to omit … a request since the [limiting] instruction might have the undesired effect of highlighting the other crimes evidence.").

---

[4] One officer testified that the dispatch call he received from the dealership described Petitioner being "strange and belligerent." [Dkt. 47-3 at 43].  The other testified as to what he was told on the same dispatch call.  [Id. at 87].

[5] After the trial judge asked why he had not objected to the officers' hearsay, Petitioner's counsel stated he didn't want to be "jumping in front of the jury for things that don't hurt."  [Dkt. No. 47-3 at 88].

[6] Although the SJC addressed only the prejudice component, Richter's doubly deferential standard still applies given the SJC adjudicated Petitioner's ineffective assistance claim on its merits.  Richter, 562 U.S. at 99.

Because the officers' hearsay testimony was cumulative, Petitioner also cannot show prejudice from its admission.  Petitioner nevertheless argues that the testimony was "prejudicial [because] it could have affected the jury's perception of the petitioner's character based on uncharged illegal activity and . . . strange and belligerent conduct."  [Dkt. No. 43 at 6].  However, the likelihood that the jury's "perception of Petitioner's character based on learning about [his driving while intoxicated on the morning of the murder] . . . could have [] affected their evaluation of his guilt" is tenuous at best.  [Dkt. No. 43 at 6]; see Janosky v. St. Amand, 594 F.3d 39, 45 (1st Cir. 2010) (holding "[a] court must weigh the strength of the evidence in determining whether a sufficient showing of prejudice has been made under Strickland").  Here, Petitioner was on trial for first-degree murder and, as the SJC noted, Petitioner's defense concerned the effects of Interferon on his ability to appreciate the wrongfulness of his conduct and conform it to the law. Facella, 478 Mass. at 394.  Cumulative evidence of his intoxication was only minimally relevant. See Apanovitch v. Houk, 466 F.3d 460, 487–88 (6th Cir. 2006) (holding testimony admitted in error was "merely duplicative" of other properly admitted testimony, and thus defendant was not denied a "fundamentally fair trial").   Accordingly, Petitioner's argument fails.

B. Limiting Instructions

Petitioner next argues his counsel was constitutionally ineffective by: (1) failing to request limiting instructions for testimony from witness Rippetoe and the victim's father; and (2) requesting a late limiting instruction after Capaldo's entire testimony.  [Dkt. No. 43 at 8, 9].

Rippetoe testified that four months prior to the murder, she had been in the victim's and Petitioner's home, where she overheard Petitioner threaten to kill the victim and where Petitioner later explained that he was behaving as he did because he took interferon and his research indicated that he could use interferon as a defense to killing the victim.  Facella, 478 Mass. at n.4.  Capaldo

testified about an incident in 1997, where the victim had called her crying at 1:00 a.m., and had requested Capaldo to "come help" her because Petitioner was "repeatedly beating her and she did not think he was going to stop until he killed her." Id. at 402. As to Rippetoe's and Capaldo's respective testimonies, the SJC found that Petitioner could not show prejudice because in fact the Judge did issue a limiting instruction. Id. at 410. While Petitioner objected that the timing of the instruction limiting the jury's use of Capaldo's testimony was tardy—following Capaldo's direct examination rather than at the moment she testified about the incident—the SJC noted Petitioner cited no case and the SJC was aware of none requiring instruction in the middle of testimony. Id. at 402.

The SJC's resolution of Petitioner's objection was reasonable. Because an instruction was given, there is no basis for the claim as to Rippetoe; as to Capaldo, the timing of the limiting instruction simply does not undermine confidence in the outcome. Immediately after Capaldo's direct and well before the jury deliberated, the Court instructed the jury on the limited purpose for which they could use Capaldo's testimony. Hence, the timing of the instruction, if error at all, is of a trivial nature and could not have reasonably altered "the entire evidentiary picture." See Strickland, 466 U.S. at 696. Further, counsel asked that the instruction be given at the end of the direct examination, and counsel could have strategically preferred an instruction at least marginally removed from the impact of Capaldo's testimony about Petitioner's prior abuse in 1996, and the victim's fears that Petitioner would kill her at that time. See Facella, 478 Mass. at 402. "[T]he decision not to request a limiting instruction is solidly within the accepted range of strategic tactics employed by trial lawyers[.]" United States v. Gregory, 74 F.3d 819, 823 (7th Cir. 1996). This is especially so when the evidence is "damning," and thus a limiting instruction may draw the jury's attention to the evidence. Id.

The victim's father testified, inter alia, that Petitioner had been incarcerated during his relationship with the victim. [Dkt. No. 47-2 at 196]. As for the omitted limiting instruction subsequent to the victim's father's testimony, as the SJC concluded, evidence of Petitioner's prior incarceration was properly before the jury in the form of letters Petitioner wrote from jail. [7] Facella, 478 Mass. at 410. Thus, the victim's father's testimony informing the jury of Petitioner's prior incarceration could not have influenced the verdict. See Musladin v. Lamarque, 555 F.3d 830, 847-49 (9th Cir. 2009) (finding no prejudice for an omitted limiting instruction following a witness's hearsay statement where other properly admitted evidence could lead the jury to a similar conclusion). I thus find no prejudice to support Petitioner's Sixth Amendment claim.

C. Petitioner's History of Violence Against Women

Petitioner next alleges that he was "deprived of a substantial defense [by his counsel's] failure to properly oppose and/or minimize the highly prejudicial rebuttal evidence." [Dkt. No 43 at 10]. Specifically, he challenges three aspects of his counsel's performance on the Commonwealth's rebuttal: (1) the failure to file a motion in limine to preclude the testimony of Petitioner's ex-girlfriend, Ellen Markham; (2) the failure to cross-examine Markham; and (3) the failure to object to a redacted version of a 1989 plea agreement memorandum. [8]

---

[7] The victim's father testified about letters Petitioner had sent to the victim while he was incarcerated. [Dkt. No 47-2 at 204]. In the letters, inter alia, Petitioner accused the victim of "being unfaithful to him," and that she "must pay to the same extreme as the wrong you've done to me." Facella, 478 Mass. at 401. The SJC ruled that the letters were admissible to show "the nature of the parties' relationship." Id. Although the letters revealed that Petitioner had been incarcerated when he wrote them, the SJC ruled that "sanitizing the letters to remove any references to [Petitioner's] incarceration would have rendered them [] incomprehensible." Id.

[8] Petitioner had pleaded guilty to multiple counts of Assault and Battery with a Dangerous weapon (a cigarette, a belt, a shot foot, as well as three other weapons), and kidnapping. [Dkt. No 43-1 at 41].

1. <u>Omitted Motion in Limine</u>

On the seventh day of the trial, the Commonwealth presented Ellen Markham, Petitioner's former girlfriend, as a key rebuttal witness.  [Dkt. No. 43 at 12].  Markham testified that Petitioner was violent with her during their relationship from 1978 to 1983, at a time he was not taking interferon.  <u>Facella</u>, 478 Mass. at 403.[9]  Petitioner argues that because of the "highly prejudicial and inflammatory nature" of her testimony, his counsel's failure to preclude her testimony through a motion in limine could not have been a strategic decision.  [Dkt. 43 at 12].   The SJC concluded that a motion in limine would have been futile because Markham's testimony was relevant to rebutting the interferon defense.  <u>Facella</u>, 478 Mass. at 404 (citations omitted) ("As the trial judge here succinctly stated, 'If the defendant's saying, 'I killed her because of [i]nterferon,' and [the rebuttal evidence shows that] he almost killed somebody else in a horrible incident when he wasn't on interferon, then it rebuts the defense.").   I find this interpretation reasonable.   Under Massachusetts law, Markham's testimony was admissible to prove Petitioner's violent impulses were unrelated to interferon; hence, a motion in limine would have been futile.  <u>See United States v. Wright</u>, 573 F.2d 681, 684 (1st Cir.1978) ("Counsel is not required to waste the court's time with futile or frivolous motions"); <u>see also</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, (2005) (holding "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").   As

---

[9] The SJC summarized her testimony as follows:

> She described how [Petitioner] inflicted upon her over a dozen black eyes, numerous bruises, and several cigarette burns on her hands, shoulder, and chest. She testified that [Petitioner] would strike her in the face whenever the songs by a former boyfriend, who was a musician, came on the radio, and related one incident where [Petitioner] beat her with a long metal bar because she had turned down the heat too low in their apartment. She said, "It didn't really seem to matter what would spark [Petitioner's] temper." She also testified that [Petitioner] once threatened to kill her and, on another occasion, to "mess up your face [so] bad that no one will ever want to look at you again."

<u>Facella</u>, 478 Mass. at 403.

such, Petitioner cannot show that the omitted, futile motion "resulted in an unfair or unreliable proceeding." Lockhart, 506 U.S. at 369-70.

2. Failure to Cross-Examine Ellen Markham

Petitioner next argues that his counsel should have cross-examined and contextualized Markham's testimony by introducing rebuttal evidence that Markham and Petitioner had engaged in a consensual, sado-masochistic sexual relationship. [Dkt. No. 43 at 15]. He further argues his counsel should have questioned Markham about her animosity towards Petitioner, given he had informed his counsel that he left her for another woman. Id. at 14. The SJC rejected Petitioner's claim, noting that even if cross-examination had occurred, the violence about which Markham testified was so grossly disproportionate to a consensual sado-masochistic practice that cross-examination of Markham would not have impeached her testimony. Facella, 478 Mass. at 411.

Petitioner's argument remains unpersuasive on habeas review. "Experienced trial attorneys may choose not to cross examine witnesses where the probable result is a mere repetition and strengthening of the direct testimony. Counsel [] could [] reasonably conclude[] that cross examination would at best be futile and at worst self-destructive." United States v. Moreno Morales, 815 F.2d 725, 751-52 (1st Cir. 1987). Here, as the SJC noted, Markham's testimony reflected non-consensual violence. For instance, Markham testified that "[Petitioner] would strike [Markham] in the face whenever the songs of a former boyfriend played on the radio and detailed one incident where [Petitioner] beat her with a long metal bar because she had turned down the heat too low in their apartment."[10] Facella, 478 Mass. at 411. In light of the nature of the violence and the circumstances showing that Markham did not consent to the violence, Petitioner's counsel could reasonably have decided cross examination might only prejudice Petitioner.

---

[10] Markham also indicated to the jury a cigarette burn that Petitioner had given her. [Dkt. No. 47-7 at 114].

Nor did counsel's failure to cross-examine Markham "affect[] the jury's perception of the damaging rebuttal testimony." [Dkt. No 43 at 15]. Had the cross-examination occurred, the disproportionate violence still would have supported the prosecution's argument that independent of Interferon, Petitioner had uncontrollable, violent tendencies. See Scarpa, 38 F.3d at 16 (finding no prejudice given "petitioner has failed to identify any promising line of defense or to construct a plausible scenario that, if exploited, might have given the jury pause"). Accordingly, the SJC reasonably applied Strickland, given the unconvincing likelihood that cross-examination would have weakened Markham's testimony.

3. 1989 Plea Memorandum

Petitioner next argues that his counsel demonstrated ineffective assistance when he failed to object to a redacted version of a 1989 plea memorandum, which was read to the jury. [Dkt No. 43. at 17]. The redacted memorandum recounted facts supporting Petitioner's guilty plea to assaulting a former girlfriend in 1989. [Dkt No. 47-7 at 124]. Petitioner argues the plea memorandum wrongly described a "normal boyfriend and girlfriend relationship" because it redacted a statement that the couple had engaged in "consensual bondage," again alleging a sado-masochistic relationship. [Dkt No. 43. at 17; Dkt. No. 47-7 at 134]. [11] Petitioner argues the redactions "painted a wholly incomplete and misleading picture of the parties' relationship." [Dkt No. 43. at 17]. The SJC rejected this claim, holding again that even if the jury was aware of the sado-masochistic relationship, the evidence would have strengthened the Commonwealth's

---

[11] In part, the memorandum recited:

"[Petitioner] then put a dog collar around her neck and started to whip her with a studded belt. During this time the victim was pushed to the floor and he tied her ankles, knees and thighs with a leather strap. He beat her repeatedly until she was covered with blood, and then stopped to take Polaroid snapshots of her as she lay on the floor bleeding."

[Dkt. No. 47-7 at 141].

rebuttal argument "that [Petitioner] was unable to restrain himself from acts of extreme physical violence well before he ever took interferon."   Facella, 478 Mass. at 412.

Petitioner's argument is unpersuasive.   As the SJC recognized, whatever the nature of Petitioner's relationship with his former girlfriend, because Petitioner admitted he went "overboard" during the assault, illustrated by the fact of and colloquy at his guilty plea, the evidence of sado-masochism, "only would have bolstered the core of the Commonwealth's rebuttal argument: that the defendant was unable to restrain himself from acts of extreme physical violence well before he ever took interferon." Facella, 478 Mass. at 412.   Hence, the redaction of reference to the sado-masochistic relationship can hardly be characterized as prejudicial.   Further, although Petitioner's counsel did not object to the judge's request to redact reference to a consensual sado-masochistic relationship, Petitioner's counsel objected and attempted to object to other portions of the memorandum.   [Dkt. No. 47-7 at 135–36].[12]   Counsel's selective objections show tactical decision-making that is protected by the deferential Strickland standard.   See Strickland, 466 U.S. at 689.   Moreover, after the "consensual bondage" portion was redacted, the Commonwealth replaced it with "[Petitioner] had never beat or abused the victim." [Dkt. No. 47-7 at 135].   Finally, as the SJC noted, the mention of "bondage" could have actually strengthened the argument that Petitioner could not control his violence prior to taking Interferon, given the evidence that the assault was non-consensual.   Thus, the record reflects a sound evaluation of the risks of including details of Petitioner's bondage proclivities, and Petitioner does not offer any persuasive rebuttal. See Scarpa, 38 F.3d at 16.   I thus find the SJC's interpretation reasonable.

---

[12] For instance, counsel successfully argued for redacting, "[t]o end this state of fear, she would have to." Id.

D.  <u>Expert Testimony</u>

Petitioner next claims ineffective assistance because his counsel failed to retain his requested expert psychiatrist, Dr. Ablow, to describe the effects Interferon had on Petitioner, despite the court granting funds to do so and Petitioner's "vehement" opposition to his counsel's chosen expert psychiatrist, Dr. Beck. [Dkt. No. 43 at 22].    After pretrial voir dire, Petitioner's counsel elected not to proceed with Dr. Beck's testimony because Dr. Beck was "less confident" in his opinion after he learned Petitioner had previously used another drug—Prozac—as a defense to a violent crime against a woman.  [Dkt. No. 43-1 at p. 31 ¶ 20].  Instead, Petitioner's counsel called two doctors, Dr. Feinman and Dr. Winfield, to testify on his client's behalf.  [Id. at p. 31 ¶ 19].  Petitioner argues, absent Dr. Ablow's opinion, he was "left without an expert who had personally evaluated him to testify on his behalf . . . significantly damaging [his] sole defense." [Dkt. No 43 at 23].  The SJC ruled that Petitioner's counsel had a reasonable, strategic decision for proceeding without Dr. Ablow's opinion, as he believed Petitioner's prior use of a Prozac defense would undermine the Interferon defense.  Facella, 478 Mass. at 413.

Petitioner has failed to demonstrate that the SJC's finding was unreasonable.  "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" Hinton v Alabama, 571 U.S. 263, 275 (2014) (quoting Strickland, 466 U.S. at 690).  Petitioner fails to acknowledge his counsel's rationale for proceeding without Dr. Beck: Dr. Beck was less confident in his findings after he was informed that Petitioner had used Prozac as a criminal defense previously.  [Dkt. No. 43-1 at p. 31 ¶ 20].  Petitioner's counsel seemed intent on preventing Petitioner's previous Prozac defense from reaching the jury, as he also excluded Dr. Ablow's testimony to avoid this.  See Facella, 478 Mass. at 413.  Counsel may have thought the Prozac

defense would undermine Petitioner's credibility on the Interferon defense, especially in light of Rippetoe's testimony that he threatened to kill the victim and use Interferon as a defense.  Id. at 398 n.4.  After making the strategic decision to not present Dr. Beck's testimony, Petitioner's counsel called two experts to testify on the side-effects of Interferon.  Id. at 400.  Although neither doctor had reviewed Petitioner's medical records nor interviewed him, [Dkt. No 43 at 23], Petitioner's counsel may have concluded this was the best way to simultaneously introduce expert testimony concerning Interferon's negative side-effects and prevent the jury from discovering Petitioner's previous use of a different medication to avoid criminal responsibility.  See Horton v. Allen, 370 F.3d 75, 86 (1st Cir. 2004) (finding no deficient performance when counsel failed to call a witness given they would have been open to damaging impeachment).

Petitioner's argument that his counsel's failure to retain Dr. Ablow directly harmed his case is also unpersuasive.   [Dkt. No 43 at 25].   As the SJC noted, "the potential effects of interferon on [Petitioner's] capacity to conform his conduct to the law were thoroughly explored at trial."  Facella, 478 Mass. at 413.  Petitioner's counsel called two expert witnesses to testify as to how Interferon can affect one's aggression and serotonin functions months after taking the medication, as well one's ability to form the intent to kill.  Id. at 400.  Moreover, the Commonwealth's rebuttal evidence strongly supported the conclusion that Petitioner could not control his violence independently of taking Interferon.  See Strickland, 466 U.S. at 696 (holding a "conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support").  Given the inclusion of the experts' opinions and the substantial rebuttal evidence, Petitioner has failed to demonstrate that without Dr. Ablow's opinion, the trial was "fundamentally unfair or unreliable." Lockhart, 506 U.S. at 369.

E.  Counsel's Closing Remarks

In his final argument, Petitioner claims ineffective assistance given his counsel's improper and prejudicial closing argument.  [Dkt. No. 43 at 26].  The SJC summarized the three remarks as follows:

> [Petitioner] contends that counsel (1) offered personal opinions about [Petitioner's] bad character, for example, stating that "he is a disgusting human being"; (2) vouched for the credibility of Rippetoe's testimony regarding [Petitioner's] statement that he would have killed the victim if Rippetoe had not been present; and (3) referred to facts not in evidence by suggesting to the jury that [Petitioner] had abused other women not mentioned in any part of the case.

Facella, 478 Mass. at 412.  Petitioner argues that the remarks could not be based on any reasonable trial strategy, especially considering his counsel admitted "in hindsight," that "he should not have made those statements."  [Dkt. No 43 at 34; Dkt. No. 43-1 at 7].   The SJC rejected this argument, noting that the remarks could reasonably be viewed as "furthering counsel's interferon-based defense strategy," and that it would be incorrect to "characterize strategic decisions as ineffective assistance merely because they prove unsuccessful."  Facella, 478 Mass. at 412. The SJC also rejected Petitioner's prejudice argument, given (1) the judge had instructed the jury that they could not use the closing arguments as evidence and (2) the remarks were not "central to [Petitioner's] or the Commonwealth's theory of the case."  Id. at 412-13.

Petitioner's counsel may believe "in hindsight" that he erred, but the question before this court is whether the SJC came to a reasonable decision that Petitioner's counsel, at the time of trial, was not so ineffective as to prejudice Petitioner.  See Harrington, 562 U.S. at 105.  While Petitioner counsel's closing statement was not without risks and deficiencies, the SJC was reasonable in finding that Petitioner's counsel was not ineffective.  The entirety of the closing indicates that Petitioner's counsel was making a strategic decision to gain credibility with the

jury,[13] while attempting to focus the jury's attention on the effects of Interferon on his client.[14] Given this strategy, Petitioner's counsel's closing remarks were not "so patently unreasonable that no competent attorney would have made [them]."  See Pena, 736 F.3d at 605 (1st Cir. 2013) (quotations omitted); see also United States v. Rodriguez, 675 F.3d 48, 57 (1st Cir. 2012) (finding no deficient performance where defense counsel's strategy ultimately proved unconvincing to the jury).

Even if the remarks evinced ineffective assistance of counsel, Petitioner has still not proven that they resulted in any prejudice to him.  As the SJC noted, the trial judge instructed the jury that the closing arguments of counsel were not evidence.  Facella, 478 Mass. at 412.  Moreover, a habeas court must "consider the totality of the evidence before the judge or jury," as some errors may have only had a "trivial" impact on proceedings, whereas others could "alter [] the entire evidentiary picture."  Strickland, 466 U.S. at 696.  Considering the substantial evidence the Commonwealth presented during its case-in-chief and then during rebuttal showing Petitioner's violence toward women before he ever took Interferon, it is unlikely the comments "altered the evidentiary picture" of Petitioner's trial.  Id.  Accordingly, Petitioner's argument lacks merit.

---

[13]  In his affidavit, Petitioner's counsel stated that was his intention, albeit in hindsight he wished he had not done so. [Dkt. No 43-1 at 6, 7].

[14] Following counsel's statement that the jury should ignore what a "disgusting human being" Petitioner is, counsel proceeded to state: "[g]ive him the benefit of the doubt and make the prosecution prove its case. Don't let emotion enter into this case, [and] then you can start dealing with the issues." [Dkt. No. 47-8 at 33–34].  Furthermore, after vouching for the credibility of Rippetoe's testimony, Petitioner's counsel proceeded to state "but on that date… he was on Interferon and he acted entirely consistent with someone on Interferon who was in a rage." [Dkt. No 47-8 at 46].   Petitioner's counsel's statement to the jury that "there were other [abused women] that the prosecution just couldn't uncover," [Dkt. No. 47-8 at 47], was followed by his plea to the jury to "look at the evidence in a light favorable to him . . . [or else] you really haven't done your job." [Id. at 48].

V.    <u>CONCLUSION</u>

For the foregoing reasons, I hereby RECOMMEND that Petitioner's amended petition for

a writ of habeas corpus [Dkt. No. 23] be DENIED and that the instant matter be DISMISSED.[15]


/s/ David H. Hennessy___
David H. Hennessy
United States Magistrate Judge

---

[15] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  <u>See</u> <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 275 (1st Cir. 1988); <u>United States v. Emiliano Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 604-05 (1st Cir. 1980); <u>see</u> <u>also</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).